UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEBRA ANN HADNOT,

    Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

    No. C 07-5504 PJH

**ORDER RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Debra Ann Hadnot ("Hadnot") seeks judicial review of the decision of the Social Security Administration Commissioner ("Commissioner") denying her claim for disability benefits pursuant to 42 U.S.C. § 405(g). This action is before the court on Hadnot's motion for summary judgment, the Commissioner's cross-motion for summary judgment, and Hadnot's alternative motion to remand. Having read the parties' papers and administrative record, and having carefully considered their arguments and relevant legal authority, the court GRANTS the Commissioner's cross-motion for summary judgment, and DENIES Hadnot's motion for summary judgment and alternative motion to remand.

**BACKGROUND**

Hadnot filed an application for Social Security Disability Insurance Benefits ("DIB") on November 30, 2004. Administrative Transcript ("A.T.") 88. She alleged disability beginning March 16, 2004, due to carpal tunnel, neck and back injuries, and severe headaches. A.T. 61, 116-17. The Social Security Administration ("SSA") denied her application on March 29, 2005, finding that her condition was not severe enough to prevent her from working. A.T. 70. She subsequently applied for Supplemental Security Income ("SSI") on May 27, 2005. A.T. 110. The SSA denied both of her DIB and SSI claims upon reconsideration on August 18, 2005, again finding that her conditions were not sufficiently

severe. A.T. 61. Hadnot filed a timely request for hearing on October 20, 2005. A.T. 60. The hearing was held on May 10, 2007, before Administrative Law Judge Richard P. Laverdure ("the ALJ"), who rendered an unfavorable decision on June 21, 2007. A.T. 13-23. The ALJ found her not "disabled" within the meaning of the Social Security Act. A.T. 13. She then requested review by the Appeals Council on June 25, 2007, but the Appeals Council denied her request on September 1, 2007. A.T. 5. On April 26, 2008, she brought this action seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the ALJ hearing, Hadnot was fifty years-old and had completed two years of college. A.T. 88, 120. She had previously worked as an inventory clerk, an office clerk, a mail bag inspector, and a material handler. A.T. 22, 643-44.

## STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act ("the Act") provides for the payment of disability insurance benefits to people who have contributed to the Social Security system and who suffer from a physical or mental disability. See 42 U.S.C. § 423 (a)(1). To evaluate whether a claimant is disabled within the meaning of the Act, the ALJ must use a five-step analysis. 20 C.F.R. § 404.1520. The ALJ may terminate the analysis at any stage where a decision can be made that the claimant is or is not disabled. See Pitzer v. Sullivan, 908 F.2d 502, 504 (9th Cir. 1990).

At step one, the ALJ determines whether the claimant is engaged in any "substantial gainful activity," which would automatically preclude the claimant from receiving disability benefits. See 20 C.F.R. § 404.1520(a)(4)(I). If not, at the second step, the ALJ must consider whether the claimant suffers from a severe impairment which "significantly limits [the claimant's] physical or mental ability to do basic work activities." See 20 C.F.R. § 404.1520(a)(4)(ii). The third step requires the ALJ to compare the claimant's impairment to a listing of impairments in the regulations. If the claimant's impairment or combination of impairments meets or equals the severity of any medical condition contained in the listing, the claimant is presumed disabled and is awarded benefits. See 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant's condition does not meet or equal a listing, the ALJ must proceed to step four to consider whether the claimant has sufficient "residual functional capacity" ("RFC") to perform his past work despite the limitations caused by the impairment. See 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant cannot perform his past work, the Commissioner is required to show, at step five, that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and past work experience. See 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).

Overall, in steps one through four, the claimant has the burden to demonstrate a severe impairment and an inability to engage in his previous occupation. Andrews v. Shahala, 53 F.3d 1035, 1040 (9th Cir. 1995).  If the analysis proceeds to step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other work. Id.

**ALJ's FINDINGS**

In this case, the ALJ determined that Hadnot was not disabled at step four of the disability evaluation.

At step one, the ALJ determined that Hadnot had not engaged in substantial gainful activity since March 16, 2004, her alleged onset date of disability.  A.T. 15.  At step two, the ALJ determined that Hadnot's severe impairments included bilateral carpal tunnel syndrome, mild degenerative disease of the cervical spine, degenerative disc disease of the lumbar spine, and contact dermatitis. Id.  At step three, the ALJ found that Hadnot's impairments, even in combination, did not meet or equal in severity any of the listed impairments.  A.T. 16.

Before proceeding to step four, the ALJ assessed Hadnot's RFC.  First, he accepted the conclusion by Dr. Rajguru, a consultative physician, that Hadnot was able to lift ten pounds frequently and twenty pounds occasionally.  However, the ALJ rejected Dr. Rajguru's conclusion that Hadnot was limited to standing or walking for only two hours in an eight-hour day.  A.T. 19.  He found this limitation unsupported by other examining

1 physicians' medical findings. A.T. 19. Instead, he found that Hadnot was capable of
2 walking or standing for six hours in an eight-hour work day. A.T. 19, 337, 343.

3    Second, the ALJ gave significant weight to the conclusions of Dr. Charles, a doctor
4 who examined Hadnot multiple times between May 2005 and September 2006 in
5 conjunction with a worker's compensation case she filed. A.T. 20, 534-557. Dr. Charles
6 recommended that Hadnot avoid repetitive heavy work in regards to her spine, repetitive
7 twisting and turning of the neck, and repetitive pushing, pulling, and grasping of both of her
8 upper extremities. A.T. 20, 535, 539-40. The ALJ incorporated Dr. Charles'
9 recommendations into his RFC assessment. A.T. 20.

10    Third, the ALJ evaluated the assessment by Dr. Shortz, a doctor who treated Hadnot
11 for her cervical and lumbar disc disease from August 2005 until February 2007. A.T. 21,
12 568-582. Dr. Shortz reported that Hadnot had failed to respond to conservative treatment
13 such as medication and physical therapy. A.T. 573. He also concluded that Hadnot was
14 "temporarily totally disabled," and instructed her to "remain off-work." A.T. 574. The ALJ
15 agreed with Dr. Shortz that Hadnot could not return to her previous medium to heavy work.
16 A.T. 21. However, the ALJ also noted that nothing in Dr. Shortz's findings suggested that
17 Hadnot is precluded from performing light work. Id.

18    Fourth, the ALJ accepted the recommendations of Dr. Lapins, Hadnot's examining
19 dermatologist. A.T. 21. Dr. Lapins found Hadnot's hands sensitive to nickel, and
20 diagnosed her with dyshidrotic eczema, a skin condition characterized by fluid-filled blisters.
21 A.T. 526. He recommended that she protect her skin against any harsh exposure to nickel
22 or sensitizing agents, excessive pressure or friction, and prolonged wet work. A.T. 526.

23    Moreover, the ALJ considered the testimony of the medical expert, Dr. Gurvey, who
24 reviewed Hadnot's medical records but neither treated nor examined her. A.T. 21, 608.
25 Although the ALJ generally accepted Dr. Gurvey's testimony, which would support a
26 functional capacity for medium work, he found that the record as a whole was more
27 consistent with a limitation to light work. A.T. 21.

28

4

Furthermore, the ALJ assessed the credibility of Hadnot's pain and symptom allegations. He discredited her testimony to the effect that she contended she was precluded from engaging in any substantial gainful activity, finding those statements inconsistent with medical evidence and her other admissions and conduct. A.T. 22.

In considering all the evidence in the record, the ALJ concluded that Hadnot retained an RFC to lift and carry up to ten pounds frequently and up to twenty pounds occasionally, and to walk, stand, or sit for six hours in an eight-hour work day. A.T. 16. However, he found that Hadnot possessed the following functional limitations: (1) she could not engage in repetitive rotation of her neck; (2) she could occasionally crawl but could not climb ladders, ropes, or scaffolds; (3) she could not engage in constant downward flexion of the bilateral wrists; (4) she could not repetitively finger objects for more than thirty minutes without a five-minute break; (5) she could not repetitively forcefully grip, grasp, torque, push, or pull with her bilateral upper extremities; and (6) she must avoid skin contact with nickel, nickel alloys, noxious agents, and wetness. A.T. 16-17.

Finally, the ALJ consulted Malcolm Brodzinsky, the vocational expert (the "VE"). The VE testified that Hadnot could perform her past relevant work as an inventory clerk, an office clerk, or a mail bag inspector if she did not need to wear thin cotton gloves. A.T. 645, 648. However, the VE testified that with a glove limitation, Hadnot would be unable to perform any of her past relevant work. A.T. 655, 656. The ALJ nevertheless concluded that Hadnot retained the capacity to perform her past relevant work as an inventory clerk and as an office clerk, and found her not disabled at step four of the evaluation process. A.T. 22.

## STANDARD OF REVIEW

This court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the his findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted). "Substantial evidence" means more than a scintilla, but less than a preponderance, or evidence which a

reasonable person might accept as adequate to support a conclusion. Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). The court is required to review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's decision. Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1991) (citation omitted).

When the Appeals Council denies review after evaluating the entire record, including newly submitted evidence, that new evidence becomes a part of the administrative record to be reviewed by this court on appeal. See Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir. 1993). Thus, this court must consider the evidence before both the ALJ and the Appeals Council in reviewing the ALJ's decision. Id.

**ISSUES**

Hadnot seeks reversal of the Commissioner's denial of disability insurance benefits, arguing that:

(1)  the ALJ failed to develop the record regarding limitations associated with her dermatological condition;

(2)  the ALJ failed to find many of her impairments as "severe" at step two;

(3)  the ALJ improperly rejected and misstated the opinions of her treating and examining physicians;

(4)  the ALJ rejected her testimony without providing a clear and convincing reason;

(5)  the ALJ rejected her daughter's testimony without providing a germane reason; and

(6)  the ALJ posed to the vocational expert ("VE") an improper hypothetical question that did not set out all of her limitations and restrictions.

**DISCUSSION**

**1.      The ALJ fairly and fully developed the record.**

Hadnot argues that the ALJ failed to develop the record regarding limitations associated with the dermatological condition on her hands. Specifically, she asserts that the ALJ failed to seek clarification regarding Dr. Lapins' assessed limitation that she avoid pressure to her hands.

The Ninth Circuit has ruled that the ALJ has a duty to assist in developing the record even though the burden of demonstrating a disability lies with the claimant. Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001). This duty exists even when the claimant is represented by counsel. Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996).

Under the circumstances here, however, Hadnot's reliance on this rule is misplaced. The hearing transcript and Hadnot's motion reveal that her argument is wholly premised on the mistaken notion that she should avoid *all* pressure to her hands. See A.T. 632-38, 648-49; Pl's Mot. for Summary Judgment, p. 18-19. Rather, Dr. Lapins' actual opinion was that Hadnot should protect her skin from *excessive* pressure or friction. A.T. 526. Specifically, Dr. Lapins advised that Hadnot "be concerned about protecting [her] skin from any type of harsh exposure, particularly regarding the handling of nickel, *excessive* pressure or friction, and even prolonged wet work." A.T. 526 (emphasis added).

The ALJ adopted Dr. Lapins' actual opinion in his RFC assessment. Moreover, Dr. Lapins' opinion was consistent with Hadnot's own admissions regarding her abilities to shop, do laundry, and wash dishes. A.T. 21, 633-35. Because the record here was not ambiguous or insufficient, the ALJ's duty to develop the record was not triggered, and his adoption of Dr. Lapins' opinion without further clarification was not legal error. See Smolen, 80 F.3d at 1288 (explaining that duty to develop record arises only when the ALJ finds the record insufficient to properly evaluate the evidence). Accordingly, Hadnot is not entitled to relief based on this claim.

**2.     The ALJ did not err in determining Hadnot's severe impairments at step two.**

Hadnot argues that the ALJ failed to find many of her impairments as "severe" at step two. As noted above, the ALJ found Hadnot severely impaired due only to bilateral carpal tunnel syndrome, mild degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, and contact dermatitis. Hadnot argues that the ALJ should have also determined the following impairments "severe": depression, anxiety, adjustment disorder, cervical radiculopathy, bilateral wrist tendinitis, chronic left leg pain syndrome, and left ulnar neuropathy at the elbow. By failing to find those impairments as severe, she argues, the ALJ foreclosed subsequent consideration of their impact on her functional ability.

An impairment or a combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Examples of "basic work activities" include the use of judgment; responding appropriately to supervision, co-workers and usual work situations; dealing with changes in a routine work setting; and understanding, carrying out, and remembering simple instructions. See 20 C.F.R. § 404.1521. The Ninth Circuit has defined the step two inquiry as "a de minimis screening device to dispose of groundless claims." Smolen, 80 F.3d at 1290.

**A.     Mental impairments**

The record contains conflicting medical opinions regarding the severity of Hadnot's mental impairments. Hadnot was first diagnosed with a depressive disorder on March 19, 2004, three days after the alleged onset date of disability, by Dr. Stern, her treating psychiatrist. A.T. 595. For Hadnot's treatment, Dr. Stern recommended individual and group therapy, and referred her to see Dr. Holtzman for medication. A.T. 595. Dr. Stern expected Hadnot to return to her "regular work" on May 3, 2004. A.T. 595.

On June 3, 2004, Dr. Walcott examined Hadnot for a worker's compensation psychiatric evaluation, and reported that she was being treated by Dr. Stern on a weekly or

biweekly basis with individual psychotherapy[1] and had recently started taking Paxil, an antidepressant, as prescribed by Dr. Holtzman. A.T. 517. Although Dr. Walcott found that Hadnot's psychiatric symptoms were not sufficiently severe to support Dr. Stern's diagnosis of a depressive disorder, he found that her symptoms at least suggested an adjustment disorder with depressed mood. A.T. 512. Moreover, he opined that Hadnot's psychiatric symptoms were not sufficiently severe "to justify establishing any time interval of total and temporary psychiatric disability." A.T. 512. Furthermore, he reported that although Hadnot did not return to work on May 3, 2004, per Dr. Stern's recommendation, her absence was "due to physical health rather than mental health reasons." A.T. 514.

On December 17, 2004, Dr. Kipperman examined Hadnot and diagnosed her with depressive and anxiety disorders. A.T. 277, 295. Specifically, Dr. Kipperman found that Hadnot had a low Global Assessment of Functioning ("GAF") score of 45[2] and had difficulty maintaining concentration due to pain, depression, generalized malaise, and difficulty in assimilating and processing information. A.T. 273, 278. He concluded that "[i]t is clear that Ms. Hadnot remains temporarily totally disabled on a psychiatric basis." A.T. 295. In terms of treatment, Dr. Kipperman concurred with Dr. Stern, recommending weekly supportive psychotherapy with a psychiatrist and antidepressant medication. A.T. 283-84.

Also on December 17, 2004, and again on January 7, 2005, Hadnot was examined by Paul Good, a Ph.D. psychologist. Like Drs. Stern and Kipperman, Good also diagnosed Hadnot with depression and anxiety disorder. A.T. 250. However, unlike Dr. Kipperman, he opined that "[w]hatever emotional problems [Hadnot] is now having, they do not appear to be interfering with the efficiency of her mental operations." A.T. 250.

In resolving conflicting medical opinion, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, (2) physicians who do not treat but examine the

---

[1] Hadnot failed to provide any treatment records from Dr. Stern. It is unclear from the record how long her treatment lasted.

[2] According to the American Psychiatric Association, a GAF score of 45 indicates a patient with "serious symptoms" or "serious impairment in social, occupational, or school functioning."

9

1  claimant (examining physicians), and (3) physicians who neither treat nor examine the
2  claimant (non-examining physicians). Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).
3  Generally, weight is given in descending order to the opinions of the three types of
4  physicians. Id. When the opinion of a treating or an examining doctor is contradicted by
5  another doctor, the ALJ may reject that opinion only for specific and legitimate reasons that
6  are supported by substantial evidence in the record. Id. at 830-31. Thus, to reject Dr.
7  Kipperman's opinion regarding the severity of Hadnot's mental impairments, the ALJ must
8  provide a specific and legitimate reason that is supported by substantial evidence.

9        Here, in rejecting Dr. Kipperman's opinion, the ALJ stated that there was no
10 evidence that Hadnot sought or needed treatment, that Hadnot appeared to have stopped
11 taking Paxil or any other medication for her mental impairments, and that Hadnot did not
12 originally allege disability on the basis of mental impairments. A.T. 15-16. However, both
13 Drs. Stern and Kipperman recommended treatment, and the record suggests that Hadnot
14 did seek treatment from Dr. Stern. In addition, "it is a questionable practice to chastise one
15 with a mental impairment for the exercise of poor judgment in seeking rehabilitation." Van
16 Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (explaining that depression is one
17 of the most under-reported illnesses in the country and that the claimant's failure to seek
18 treatment for a mental disorder until late in the day is not a substantial basis on which to
19 conclude that an examining psychologist's assessment of his condition is inaccurate).
20 Moreover, the ALJ could not infer that Hadnot's mental impairments were not severe from
21 her apparent failure to continue taking Paxil as there was evidence suggesting that she had
22 financial difficulties in obtaining Paxil in the first place. A.T. 517. Therefore, the ALJ erred
23 by not providing a legitimate reason for rejecting Dr. Kipperman's findings.

24       Nevertheless, the harmless error rule applies because substantial evidence supports
25 the ALJ's conclusion that Hadnot's mental impairments were not severe. It is
26 well-established that an ALJ may reject an examining physician's opinion in favor of a
27 treating physician's whenever inconsistencies and contradictions are present. See Lester,
28 81 F.3d 821, 830-31. Given that Dr. Kipperman's opinion was inconsistent with three other

physicians, including Dr. Stern, the treating psychiatrist, the ALJ could have provided specific and legitimate reasons to reject Dr. Kipperman's opinion. Accordingly, the court concludes that the ALJ properly found Hadnot's mental impairments not sufficiently severe. See Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992) (holding that in evaluating the evidence, the court must review the "record as a whole" and "if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

**B.     Physical impairments**

As mentioned above, Hadnot also argues that her cervical radiculopathy, bilateral wrist tendinitis, left ulnar neuropathy, and chronic left leg pain syndrome should have been found severe. To support the severity of her cervical radiculopathy, Hadnot cites to three reports from three different treating physicians: (1) Dr. Francis' November 6, 2004, report that an electromyography ("EMG") showed evidence for chronic radiculopathy, (2) Dr. Masem's February 2, 2005, report that electrodiagnostic tests were consistent with cervical radiculopathy, and (3) Dr. Shortz's June 21, 2005, diagnosis of cervical radiculitis. A.T. 366, 444, 587. However, on June 22, 2005, Dr. Charles, who examined Hadnot in conjunction with a worker's compensation case she filed, reported that Dr. Masem had stated that the electrodiagnostic tests were done "possibly too early." A.T. 563. Concurring with Dr. Masem, Dr. Charles recommended that Hadnot repeat the electrodiagnostic tests. A.T. 563. Nine months later, on March 22, 2006, Dr. Charles reported that subsequent tests were normal. A.T. 545. Nothing else in the record contradicts Dr. Charles' March 2006 report.

With respect to bilateral wrist tendinitis, there is no record evidence that it was severe. Even in her motion, Hadnot does not provide any support for this allegation, nor does she cite to any objective medical finding. After a thorough review of the record, the court finds, at most, a diagnosis of bilateral wrist tendinitis by Dr. Masem on January 23, 2006. However, Dr. Masem reported that Hadnot's upper extremity symptoms "could be characterized as intermittent and slight to moderate." A.T. 411.

With respect to her left ulnar neuropathy, Hadnot cites findings from a nerve conduction study and an EMG conducted by Dr. Akbarpour on January 31, 2006. A.T. 530. Dr. Akbarpour opined that there was evidence of left ulnar neuropathy. A.T. 532. However, the record does not show that her left ulnar neuropathy was sufficiently severe to significantly limit her physical or mental ability to do basic work activities for the purposes of a step two determination. See 20 C.F.R. § 404.1520(c).

Finally, regarding evidence of chronic leg pain syndrome, Hadnot cites to a Kaiser Permanente report in which a doctor wrote "chronic pain syndrome." A.T. 214. However, there were no objective medical findings, and again, nothing in the record suggests that Hadnot's chronic leg pain syndrome significantly limited her ability to do basic work activities.

In conclusion, the ALJ properly concluded that Hadnot's cervical radiculopathy, bilateral wrist tendinitis, left ulnar neuropathy at the elbow, and chronic leg pain syndrome were not severe physical impairments under step two.[3]

**3. The ALJ properly considered the medical opinions of Hadnot's treating and examining physicians.**

Hadnot also challenges the ALJ's treatment of the opinions of four of her physicians, Drs. Francis, Shortz, Lapins, and Rajguru, all treating or examining physicians. She contends that the ALJ tacitly rejected Dr. Francis' opinion, made an unreasonable inference from Dr. Shortz's opinion, misstated Dr. Lapins' opinion, and failed to provide a specific and legitimate reason for rejecting Dr. Rajguru's opinion.

When the opinion of a treating or an examining doctor is not contradicted by another doctor, the ALJ may reject that opinion only for "clear and convincing" reasons. Lester, 81

---

[3] The court notes that Hadnot seems to suggest in her discussion of the alleged step two error that the ALJ failed to consider the combined impact of her non-severe impairments at later stages of his analysis. See Pl. Motion at 24. Other than one ambiguous sentence, Hadnot fails to develop this argument, fails to cite to anything in the record to support this argument, and fails to cite to any legal authority. Accordingly, Hadnot has not adequately raised this issue in this appeal, and the court declines to develop Hadnot's argument for her. See Ghahremani v. Gonzales, 498 F.3d 993, 997 (9th Cir. 2007) (stating that issues raised but not supported by argument are deemed abandoned).

F.3d at 830. Even if contradicted by another doctor, that opinion can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. Id. at 830-31.

### A.   Dr. Francis

Dr. Francis was Hadnot's treating orthopaedic physician from March 2004 until March 2005. Hadnot claims that the ALJ tacitly rejected the objective findings and functional assessments in Dr. Francis' November 6, 2004, report. In his report, Dr. Francis found that Hadnot possessed limited mobility of her cervical spine and bilateral wrists, decreased sensation in her hands, an abnormal EMG indicating chronic radiculopathy, and an abnormal cervical MRI indicating degenerative disc disease. A.T. 368. He assessed her functional limitations as "[n]o forceful reaching, pushing or pulling bilaterally, no repetitive gripping bilaterally, no strenuous gripping bilaterally, no torquing or twisting motions bilaterally." A.T. 368.

Although the ALJ did not specifically mention Dr. Francis in his opinion, the court does not agree, as Hadnot suggests, that the ALJ "tacitly rejected" Dr. Francis' findings or functional assessments. The record shows that Dr. Francis' report was cumulative and consistent with later findings by other doctors, who treated or examined Hadnot between 2005 and 2007, and whose findings and opinions were accepted by the ALJ. Compare A.T. 365-93 with A.T. 520-29, 534-67, 568-99. Moreover, the ALJ adopted a RFC that was consistent with Dr. Francis' functional assessments. Thus, the ALJ effectively accepted Dr. Francis' findings and functional assessments even though he did not mention Dr. Francis in his opinion. Accordingly, the record does not support a conclusion that the ALJ "rejected" Dr. Francis' opinion.

### B.   Dr. Shortz

Dr. Shortz treated Hadnot for cervical and lumbar disc disease from August 2005 until February 2007. A.T. 568-582. Hadnot argues that the ALJ unreasonably inferred that she could perform light work from Dr. Shortz's opinion that she was "temporarily totally disabled." However, in considering medical opinions, the ALJ is required to give weight to

1  medical opinions discussing the "nature and severity of [the claimant's] impairments," but
2  *not* to a physician's ultimate opinion regarding a claimant's disability or employability status.
3  See 20 C.F.R. § 416.927(a)(2); 20 C.F.R. § 416.927 (e)(1) ("A statement by a medical
4  source that you are "disabled" or "unable to work" does not mean that we will determine
5  that you are disabled."). Thus, the ALJ was not required to consider Dr. Shortz's opinion
6  that Hadnot was "temporarily totally disabled" in determining Hadnot's disability status.
7  Nevertheless, the ALJ's inference that Hadnot could perform light work was
8  reasonable. Dr. Shortz's progress reports regarding Hadnot's physical abilities indicated
9  improvement from sedentary work in April 2006 to light work by October 2006. Compare
10 A.T. 572 with A.T. 578. In fact, Dr. Shortz marked "light work" as the definition that came
11 closest to describing her physical abilities on the same October progress report in which he
12 opined that she was "temporarily totally disabled." A.T. 572-574. Therefore, the court
13 concludes that the ALJ did not draw an unreasonable inference from Dr. Shortz's opinion.

**C.   Dr. Lapins**

15 With respect to Dr. Lapins, the examining dermatologist, Hadnot argues that the ALJ
16 misstated Dr. Lapins' opinion. Hadnot asserts that Dr. Lapins did not opine that she avoid
17 "excessive" pressure and friction, and that the ALJ instead inserted the qualifier "excessive"
18 on his own. To the contrary, the record shows that Dr. Lapins opined that Hadnot should
19 avoid "excessive" pressure. A.T. 526. The court understands Hadnot's confusion, given
20 that Dr. Lapins opined on January 25, 2005, that "[i]ndividuals with dyshidrotic eczema
21 have a general preclusion to avoid work that is considered to be harsh to the skin of the
22 hands, to include avoidance of pressure, prolonged wetness, friction, and handling of harsh
23 chemicals, etc., and also the known handling of nickel objects." A.T. 523. The word
24 "excessive" indeed did not qualify "pressure" on that report. However, later on September
25 5, 2006, Dr. Lapins opined:

> Considering the long duration of the patient's hand eczema, she can be
> considered permanent and stationary with regards to have a tendency for
> dyshidrotic eczema. *As mentioned before*, individuals with this diagnosis
> have to be concerned about protecting their skin from any type of harsh

exposure, particularly regarding the handling of nickel, *excessive* pressure or friction, and even prolonged wet work.

A.T. 526 (emphasis added). Therefore, the record unambiguously shows that Dr. Lapins' later opinion clarified his earlier opinion to mean that Hadnot should avoid "excessive" pressure and friction. Thus, the court concludes that the ALJ did not misstate Dr. Lapins' opinion.

### D. Dr. Rajguru

Dr. Rajguru was the Social Security consultative physician who examined Hadnot on February 24, 2005. He assessed Hadnot to be capable of standing or walking for two hours in an eight-hour work day. A.T. 312. However, the ALJ disagreed, and he instead found that Hadnot could stand or walk for up to six hours in an eight-hour work day. Hadnot argues that the ALJ erred in rejecting Dr. Rajguru's assessement.

As mentioned above, when an examining doctor's medical opinion is contradicted by another doctor, that opinion can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. Lester, 81 F. 3d at 830-31. The ALJ is responsible for resolving conflicts in medical testimony. Magallanes, 881 F.2d at 750. Similarly, the ALJ is responsible for resolving ambiguities in the evidence. Id. An examining physician's findings are entitled to the same weight when the examination is obtained by the Commissioner as when it is procured by the claimant. See Lester, 81 F.3d 821, 832.

Here, the ALJ provided two specific and legitimate reasons for rejecting Dr. Rajguru's assessment: (1) it was based "entirely on the claimant's report of the MRI which [Dr. Rajguru] did not review and is not in the record," and (2) it was inconsistent with the medical findings by Drs. Armanious, Noriega, and Charles, all examining doctors. A.T. 19, 310. Hadnot nevertheless claims that Dr. Rajguru's assessment was supported by medical records that Dr. Rajguru had reviewed and was consistent with the findings of Drs. Shortz and Francis.

Preliminarily, the court notes that Hadnot fails to provide any support for her claim

that Dr. Rajguru's assessment was supported by medical records that he had reviewed. It is unclear from the record, and Hadnot does not clarify in her motion, which medical records or MRI Dr. Rajguru reviewed in forming his opinion.

Moreover, Hadnot fails to explain how Dr. Rajguru's assessment was consistent with the findings of Drs. Shortz and Francis. As discussed above, Dr. Francis made findings with respect to Hadnot's upper extremities only. A.T. 368. Dr. Shortz also did not assess Hadnot's standing or walking limitations. A.T. 573. Furthermore, the issue here is not whether Dr. Rajguru's assessment could reasonably be supported by the findings of Drs. Shortz and Francis. Rather, the proper question is whether the ALJ's assessment is supported by substantial evidence. See Magallanes, 881 F.2d at 750. Here, the ALJ's assessment was supported by the objective medical findings of Drs. Armanious, Noriega, and Charles. Thus, for the reasons stated above, the court concludes that the ALJ properly rejected Dr. Rajguru's assessment.

### 4. The ALJ provided clear and convincing reasons for rejecting portions of Hadnot's testimony.

Hadnot also argues that the ALJ rejected her testimony without providing a clear and convincing reason. Specifically, she claims that the ALJ erred in rejecting her testimony to the effect that she was precluded from engaging in any substantial gainful activity.

The ALJ is responsible for determining the credibility of witnesses, including the claimant, that testify before him. Magallanes, 881 F.2d at 750. Unless there is affirmative evidence of malingering, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing. See Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005). He must articulate the testimony he finds not credible and cite evidence that undermines her complaints. See id.

In evaluating the witness' credibility, the ALJ may consider the claimant's reputation for truthfulness and inconsistencies in the claimant's testimony. See Burch, 400 F.3d at 680. Additionally, the ALJ must consider the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other

symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the effects of medication; (5) treatment other than medication; (6) any measures the claimant has taken other than treatment; and (7) any other factors concerning the claimant's functional limitations and restrictions. Id. To find the claimant not credible, "the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct, or on internal contradictions in that testimony." Light v. SSA, 119 F.3d 789, 792 (9th Cir. 1997).

Here, the ALJ found Hadnot's testimony to be generally credible. He found her testimony not fully credible only when it was inconsistent with medical evidence, her own conduct, and other parts of her testimony. Specifically, he emphasized that nothing in the record indicated that any of her doctors precluded her from all work and that Hadnot herself admitted to being able to vacuum, shop, drive, iron, do laundry and many other activities consistent with light work. A.T. 22. Thus, to the extent that Hadnot asserted that she could not engage in any substantial gainful activity, the ALJ provided clear and convincing reasons to discredit such testimony.

**5.     The ALJ provided a germane reason for rejecting Hadnot's daughter's testimony.**

Hadnot also argues that the ALJ failed to give proper weight to the testimony of her daughter, Dennisha Quilter, who submitted a report describing Hadnot's functional limitations. The ALJ accorded little weight to Quilter's response to question 22a in Section C of her report. A.T. 153. The first part of the question asked Quilter to circle the activities that Hadnot's conditions affected. Id. Quilter circled "lifting, squatting, bending, standing, walking, sitting, kneeling, stair-climbing, using hands, and completing tasks." Id. The next part of the question asked Quilter to explain how Hadnot's conditions affected each of the circled activities. Id. In response, Quilter wrote that Hadnot could lift only five to eight pounds; could walk one to two blocks before needing to rest; would constantly drop things; experienced pain from walking, standing, sitting, kneeling, stair-climbing; and could not complete tasks. Id.

17

Although the ALJ must consider competent lay testimony, "he need only provide reasons for [rejecting such testimony] that are germane to the witness." Carmickle v. Comm'r of SSA, 533 F.3d 1155, 1163 (9th Cir. 2008). For example, finding conflicts between the lay witness testimony and medical evidence is a germane reason for rejecting lay witness testimony. See Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

Here, the ALJ provided a germane reason for rejecting Quilter's written testimony. The ALJ found that the exertional limits asserted by Quilter were "completely inconsistent" with the findings of medical evaluators, including Dr. Rajguru, who examined Hadnot shortly after Quilter completed her report. A.T. 19, 148, 310. Indeed, even Dr. Rajguru's conservative assessment of Hadnot's limitations, as discussed above, did not support Quilter's observations. Dr. Rajguru opined that Hadnot could lift and carry twenty pounds occasionally and ten pounds routinely, sit for six hours in an eight-hour work day, and stand and walk for two hours on an eight-hour work day. A.T. 312. Given that Quilter's responses were inconsistent with medical evidence, the court finds that the ALJ provided a germane reason for according little weight to those responses. See Lewis, 236 F.3d 503, 511.

**6.    The ALJ's error in relying on the VE's response to a hypothetical that did not include all of Hadnot's limitations and restrictions was harmless.**

Hadnot argues that the ALJ posed to the VE an improper hypothetical question that did not set out all of her limitations and restrictions.[4]

The ALJ posed two hypothetical questions to the VE. The first hypothetical omitted Hadnot's need to wear thin cotton gloves. A.T. 645. In response, the VE testified that Hadnot could perform her past relevant work as an inventory clerk or as an office clerk. A.T. 645. The second hypothetical included Hadnot's glove limitation, and in response, the VE testified that Hadnot could not perform any of her past relevant work. A.T. 655. In finding Hadnot not disabled at step four, the ALJ relied on the VE's response to the first

---

[4] To the extent that Hadnot repeats many of her previous contentions here, the court will not address them again.

18

hypothetical. A.T. 22. Hadnot contends that the ALJ committed legal error in relying on the VE's response to the first hypothetical, which improperly excluded her glove limitation.

"[A]n ALJ is not free to disregard properly supported limitations." Robbins v. SSA, 466 F.3d 880, 886 (9th Cir. 2006). A hypothetical that omits any of the claimant's limitations is not "accurate, detailed, and supported by the medical record." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). If the hypothetical is not supported by the record, the VE's opinion "has no evidentiary value." Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

Here, Hadnot's sensitive skin condition was a supported limitation, and the ALJ acknowledged her need to wear gloves "as often as possible." A.T. 22. Thus, the first hypothetical was improper, and the ALJ erred in relying on the VE's response to that hypothetical at step four.

Nevertheless, the ALJ's erroneous determination at step four was harmless. As mentioned above, if the claimant cannot perform his past work, the Commissioner is required to show, at step five, that the claimant can perform other work that exists in significant numbers in the national economy. See 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c) ("Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country)."). The Commissioner can meet that burden by "eliciting the testimony of a vocational expert in response to a hypothetical that sets out all the limitations and restrictions of the claimant." See Andrews, 53 F.3d at 1043.

In response to the second hypothetical that properly set out all of Hadnot's limitations and restrictions, including her glove limitations, the VE testified that although Hadnot could not perform any of her past relevant work, she could work as an unskilled mail clerk, a job with approximately 120,000 positions in the national economy and 3,000 in the regional economy. A.T. 659. The VE also testified that to account for all of Hadnot's limitations and restrictions, those positions could be eroded by 40%, leaving 72,000 positions in the national economy and 1,800 in the regional economy. Id. Thus, even if

19

1  Hadnot could not return to her past relevant work, she could still perform other work that
2  exists in significant numbers in the economy.  See Meanel v. Apfel, 172 F.3d 1111, 1115
3  (9th Cir. 1999) (holding that between 1,000 and 1,500 jobs in the regional economy
4  constitutes a significant number for purposes of the Social Security Act).  Accordingly, there
5  is sufficient evidence that Hadnot is not disabled at step five of the ALJ's analysis.

## CONCLUSION

For the foregoing reasons, the court GRANTS the Commissioner's cross-motion for summary judgment, and DENIES Hadnot's motion for summary judgment and alternative motion to remand.

This order fully adjudicates the motions listed at numbers seventeen and twenty-four of the clerk's docket for this case.  The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: November 25, 2008

_____
PHYLLIS J. HAMILTON
United States District Judge